**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Mountain Valley Realty LLC, et al., | No. CV-26-08117-PCT-DWL |
| Plaintiffs, | **ORDER** |
| v. | |
| AKF Incorporated, et al., | |
| Defendants. | |

AKF Incorporated ("AKF") prevailed in an arbitration proceeding against Mountain Valley Realty LLC ("Plaintiff"), an Arizona-based realty and property management firm, and then confirmed that award via a $193,218.69 judgment issued by a New York state court. Afterward, AKF utilized an unusual feature of New York law called a "restraining notice"—governed by § 5222 *et seq.* of the New York Civil Practice Law and Rules ("CPLR")—in an effort to freeze Plaintiff's funds in anticipation of collection efforts. More specifically, in March 2026, AKF mailed a restraining notice to Wells Fargo Bank, N.A. ("Wells Fargo"), which then froze a total of $386,582.38—twice the amount of the judgment—held in various bank accounts Plaintiff had previously opened in Arizona.

Upon learning these funds had been frozen, Plaintiff retained New York counsel, reached out to AKF, and raised various objections, including that the frozen funds were not actually Plaintiff's funds but were instead security deposits, rent proceeds, and other similar types of deposits that Plaintiff was holding in trust for tenants, landlords, and property-management clients. Plaintiff also threatened to challenge the validity of the

restraining notice in New York state court, as contemplated under New York law, but then changed course and filed an action in Mohave County Superior Court against AKF and Wells Fargo (together, "Defendants"), along with a motion for a temporary restraining order ("TRO") and preliminary injunction ("PI"). The state-court judge granted a TRO without providing notice to Defendants, ordering Wells Fargo to unfreeze half of the frozen funds (while leaving $193,218.69 frozen). After AKF was later served with process—and just before a state-court PI hearing was scheduled to begin—AKF removed this action to federal court.

On June 30, 2026, after the PI motion became fully briefed, the Court held a PI hearing. (Doc. 36.) Having carefully considered the parties' arguments and the evidence presented at the hearing, the Court concludes the PI motion should be denied.

## RELEVANT BACKGROUND

Plaintiff is an Arizona LLC that does business as Black Mountain Valley Realty and Black Mountain Valley Property Management. (Doc. 1-5 at 4 ¶ 6.) It conducts, among other things, property-management operations in Arizona and does not conduct any business in New York. (*Id.* at 4 ¶ 6; Doc. 24-1 ¶¶ 1, 6.)

On July 7, 2025, AKF obtained a final arbitration award against Plaintiff (as well as against certain other non-party entities and a non-party individual) in the amount of $181,103.24. (Doc. 24-7 at 1.)

On August 19, 2025, AKF filed an application in the Supreme Court of New York, County of New York to confirm the arbitration award. (*Id.*)

On March 18, 2026, the New York court granted the confirmation application. (*Id.*)

On March 24, 2026, the New York court entered judgment against Plaintiff (and Plaintiff's co-defendants) for "the total amount of $ 193,218.69." (*Id.* at 2.)[1]

On March 30, 2026, AKF's New York counsel mailed a CPLR § 5222 restraining notice to Wells Fargo at Wells Fargo's corporate office in North Carolina. (Docs. 19-2, 19-4.) Wells Fargo subsequently froze a total of $386,582.38 that was being held in several

---

[1]    This sum was larger than the arbitration award because it included costs and interest.

of Plaintiff's Wells Fargo accounts located in Mohave County, Arizona.  (Doc. 1-5 at 3 ¶¶ 3-4.)  Specifically, Plaintiff contends that Wells Fargo froze funds in its accounts ending in 0168 (the "0168 Account"), 1313 (the "1313 Account"), 1370 (the "1370 Account"), and 0184 (the "0184 Account") (collectively, the "Arizona Accounts").[2]  (Doc. 1-8 at 4.)

Under New York law, a judgment creditor—here, AKF—serving a restraining notice must also "provide the banking institution with . . . an exemption notice and two exemption claim forms with sections titled 'ADDRESS A' and 'ADDRESS B' completed," and "[w]ithin two business days after receipt of the restraining notice or execution, exemption notice and exemption claim forms, the banking institution shall serve upon the judgment debtor"—here, Plaintiff—"the copy of the restraining notice, the exemption notice and two exemption claim forms."  CPLR § 5222-a(b)(1), (b)(3).  It appears that process was followed here, as on April 3, 2026, Sarah Juarez, "the sole owner/operator of [Plaintiff's] Property Management division" (Doc. 1-5 at 4 ¶ 7), filled out a "exemption claim form" (Doc. 19-3 at 20).  On that form, which bore the caption of the New York court that entered the judgment, Plaintiff indicated that the funds in the Arizona Accounts were exempt from restraint because they are "Trust Accounts."  (*Id.*)

On April 10, 2026, Plaintiff's New York counsel emailed the claim exemption form, along with an accompanying letter, to AKF, requesting that AKF fax the form to Wells Fargo.  (Doc. 19-3 at 16; Doc. 19-1 ¶ 5.)  In the accompanying letter, Plaintiff's New York counsel stated:

> The [Arizona Accounts] are trust / fiduciary property-management accounts maintained in Arizona.  The funds in those accounts are not the personal property of the judgment debtor and are not general operating funds of the company.  Rather, they are monies held for the benefit of third parties, including tenant security deposits, landlord rent proceeds, and maintenance reserve funds, in connection with the management of rental properties.
>
> . . .

---

[2]     In its response brief, AKF notes that Plaintiff's PI motion "claims an additional account at Wells [Fargo]" in reference to the 0184 Account.  During the PI hearing, Plaintiff seemed to only discuss three frozen accounts.  This distinction does not alter the analysis.

> New York courts applying CPLR 5222 have emphasized that the restraint is directed at the judgment debtor's property, not money belonging beneficially to someone else.
>
> . . .
>
> The New York exemption procedure expressly permits a debtor to assert that restrained funds are exempt and to seek release of the restraint through the Exemption Claim process and an Article 52 proceeding if necessary.
>
> . . .
>
> Accordingly, demand is hereby made for the immediate release of the restrained funds.

(Doc. 19-3 at 17-20.)

Between April 10 and April 21, 2026, Plaintiff's New York counsel and AKF's New York counsel exchanged a series of emails. (Doc. 19-3 at 2-16.) In those emails, AKF indicated that it "was in receipt of [Plaintiff's] April 10 letter and the Exemption Claim Form signed by Sarah Juarez" and that AKF "objects to the release of any restrained funds." (*Id.* at 9.)

On April 21, 2026, after a back-and-forth exchange over whether the Arizona Accounts are in fact third-party trust accounts, Plaintiff's New York counsel indicated that "[u]nless AKF consents to immediate release, [Plaintiff] will proceed with an emergency [order to show cause] seeking to vacate or modify the restraint and obtain expedited relief." (Doc. 19-3 at 3.) "Unless we hear back from you we will be filing said motions before the end of the week." (*Id.*)

Plaintiff did not follow through on that threat. Instead, on May 11, 2026, Plaintiff, through its current non-New York counsel, filed a verified complaint (Doc. 1-5) and an application for a TRO and PI (Doc. 1-8)[3] in Mohave County Superior Court. In the complaint, Plaintiff asserts three causes of action: (1) "Declaratory Judgment"; (2) "Temporary, Preliminary, And Permanent Injunctive Relief"; and (3) "Wrongful Restraint / Equitable Relief." (Doc. 1-5 at 8-10 ¶¶ 33-48.)

---

[3] Although the caption of Plaintiff's motion only seeks a "preliminary injunction," the motion itself also references the standard for issuing a TRO. (Doc. 1-8 at 6-7.)

On May 12, 2026, without providing notice to AKF or Wells Fargo,[4] the Mohave County Superior Court granted the TRO, "enjoining Wells Fargo . . . from transferring, using, or dissipating any portion of the $386,582.28 that have been frozen" and further ordering that "Wells Fargo Bank shall . . . release $193,363.69 to [Plaintiff]." (Doc. 1-9 at 2-3.) The order provided that "[t]his Temporary Restraining [Order] shall remain in full force and effect until further ordered of this Court." (*Id.* at 3.) The order also set "an initial Hearing on [Plaintiff]'s Application for Preliminary Injunction" for May 27, 2026. (*Id.*)

On May 20, 2026, AKF received "service of process of the Summons, [TRO], and Application for Preliminary Injunctive Relief from Plaintiffs." (Doc. 19-1 ¶ 7.)[5]

On May 26, 2026, AKF filed a notice of removal. (Doc. 1.)

On June 5, 2026, Plaintiff filed a motion for an order setting hearing on its application for injunctive relief. (Doc. 12.)[6] That same day, the Court set an expedited briefing schedule. (Doc. 15.)

On June 30, 2026, after the PI motion became fully briefed (Docs. 17, 19, 29, 34), the Court held a PI hearing (Doc. 36).[7]

---

[4]      Arizona law, like federal law, generally requires that a TRO be issued "only with notice to the adverse party" and authorizes the issuance of a no-notice TRO only when, *inter alia*, "the movant's attorney certifies in writing any efforts made to give notice or the reasons why it should not be required." Ariz. R. Civ. P. 65(a)-(b). Plaintiff did not include such a certification in its motion papers and, indeed, did not expressly request the issuance of a TRO without notice to Defendants. (Doc. 1-8.) Instead, it appears (and the parties seemed to suggest during the PI hearing) that the state-court judge chose to grant relief on that basis *sua sponte*.

[5]      Although AKF has argued, both in its briefing (Doc. 19 at 5) and during the PI hearing, that the TRO should not have been issued without notice, that issue is not before the Court. *Cf. MacPherson v. Town of Southampton*, 738 F. Supp. 2d 353, 365 (E.D.N.Y. 2010) ("[A] finding by this Court that Defendants' conduct violated Plaintiffs' due process rights would necessarily involve a review of the state court's determination that (1) no notice was required before the TROs could be issued and/or (2) the notice given to Plaintiffs by Defendants, as alleged in the Complaint, was constitutionally sufficient. Such a review would be barred by the *Rooker-Feldman* doctrine.").

[6]      Under LRCiv 3.6(d), "[i]f a motion is pending and undecided in the state court at the time of removal, the Court need not consider the motion unless and until a party files and serves a notice of pending motion." Because no party filed such a notice here, the Court was unaware of the pending PI motion until Plaintiff's June 5, 2026 filing.

[7]      On June 26, 2026, at AKF's request (Doc. 31), the Court held a telephonic status conference (Doc. 33). During the status conference, the Court authorized AKF to file a three-page sur-reply—which AKF has now done (Doc. 34). The parties also stipulated to correct page seven of Doc. 29, "advising it was Plaintiff who made the trust designations,

**DISCUSSION**

I.   Legal Standard

"A preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (cleaned up). *See also Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) ("A preliminary injunction is an extraordinary remedy never awarded as of right.") (citation omitted); *Dymo Industries, Inc. v. Tapeprinter, Inc.*, 326 F.2d 141, 143 (9th Cir. 1964) ("The grant of a preliminary injunction is the exercise of a very far reaching power never to be indulged in except in a case clearly warranting it.").

"A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter*, 555 U.S. at 20. However, "if a plaintiff can only show that there are serious questions going to the merits—a lesser showing than likelihood of success on the merits—then a preliminary injunction may still issue if the balance of hardships tips sharply in the plaintiff's favor, and the other two *Winter* factors are satisfied." *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013)

---

not Wells Fargo." (Doc. 33.) Finally, AKF also requested expedited discovery to determine whether the funds held in the Arizona Accounts are, in fact, trust funds that Plaintiff is holding on behalf of third parties. (*See also* Doc. 19 at 10 ["The Court should require [Plaintiff] to provide discovery concerning its claim that the accounts are trust/fiduciary accounts."].) The Court informed AKF that (1) a defendant is not ordinarily entitled to postpone a plaintiff's request for emergency relief on the ground that the record is insufficiently developed, *see generally TGI Friday's Inc. v. Stripes Restaurants, Inc.*, 2015 WL 2341991, *2 (E.D. Cal. 2015) ("Plaintiff, as the moving party to its motion for a preliminary injunction, bears the burden of proof of demonstrating that the requirements for a preliminary injunction have been met. Moreover, the burden on Plaintiff is a heavy one . . . . Accordingly, the lack of discovery in this action is more prejudicial to Plaintiff than Defendants, since Plaintiff carries the burden of proof on its motion. Generally, motions for expedited discovery in connection with motions for preliminary injunctions are made by the moving party requesting the injunctive relief, not the opposing party who does not carry the burden of justifying injunctive relief."); and (2) in any event, the Court would postpone resolution of this request until after hearing the evidence presented at the PI hearing. Because the Court has now denied Plaintiff's PI request, AKF's request for expedited discovery in advance of the PI hearing is moot.

- 6 -

(cleaned up).[8]  The movant "carries the burden of proof on each element of either test." *Env't. Council of Sacramento v. Slater*, 184 F. Supp. 2d 1016, 1027 (E.D. Cal. 2000).

II.    Analysis

    A.    **Likelihood Of Success On The Merits**

        1.    The Parties' Arguments

    Plaintiff advances three reasons why it is likely to succeed on the merits: (1) "[AKF] Has Not Domesticated Its Out-of-State Judgment In Arizona" (Doc. 1-8 at 8-9); (2) "New York's Separate Entity Rule Prevents The Garnishment Of [the Arizona Accounts]" (*id.* at 9-11); and (3) "[The Arizona Accounts] Are Owned Exclusively By Unrelated Third-Parties And Are Not And Cannot Be Subject To A New York Garnishment" (*id.* at 11-13.) As to its domestication argument, Plaintiff elaborates that "the [Arizona Accounts] deposited in an Arizona bank have been garnished based on a New York judgment that has not been domesticated in Arizona as required by Arizona's Revised Uniform Enforcement Of Foreign Judgment Act" and that "[u]nder Arizona law, a foreign judgment must be domesticated for enforcement purposes."  (*Id.* at 8.)

---

[8]    The existence of serious questions often turns on the presence of disputed factual issues. *Assurance Wireless USA, L.P. v. Reynolds*, 100 F.4th 1024, 1031 (9th Cir. 2024) ("[P]arties do not show serious questions when they raise a merely plausible claim, nor can a district court forgo legal analysis just because it has not identified precedent that places the question beyond debate.  This less demanding merits standard requires serious factual questions that need to be resolved in the case.") (cleaned up); *Alliance for the Wild Rockies v. Petrick*, 68 F.4th 475, 497 (9th Cir. 2023) ("[L]ike many legal questions, the meaning of HFRA's unambiguous provisions would not become clearer with at least some discovery or a further hearing on the merits.  There is no need for more deliberative investigation or development of the record to resolve the plain meaning of HFRA.") (cleaned up). However, the Ninth Circuit has indicated that unsettled and debatable legal issues may also qualify as serious questions.  *See, e.g.*, *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1184, 1195 (9th Cir. 2022) (identifying unresolved issue of statutory interpretation over the meaning of the term "without authorization" before concluding that "[a]t the very least, . . . hiQ has raised a serious question as to this issue" and also noting that, during an earlier stage in the case, "we focused on whether hiQ had raised serious questions on the merits of the factual *and legal issues* presented to us") (emphasis added); *City of Tenakee Springs v. Clough*, 915 F.2d 1308, 1311 (9th Cir. 1990) (reversing denial of preliminary injunction in part because the movants' "interpretation of the language of the contract [was] not unreasonable" and raised "at least a serious question as to its proper interpretation"); *Adultworld Bookstore v. City of Fresno*, 758 F.2d 1348, 1351-52 (9th Cir. 1985) (reversing denial of preliminary injunction because "the question of the constitutionality of the Fresno ordinance presents a fair ground for litigation" and "at least a serious litigation question").

In response, AKF sets forth a host of arguments.[9] Among other things, AKF argues that "[t]here is no garnishment" but rather "a restraining notice." (Doc. 19 at 2.) AKF argues that under CPLR § 5222, "there is a two-step process rather than a single 'garnishment'" and that a "restraining notice operates as an injunction and merely restrains a party upon which it is served from making any transfer." (*Id.* at 8, cleaned up.) AKF argues that "the restraining notice confers upon the creditor no lien upon or interest in the property . . . [and to] achieve these objectives further enforcement procedures are required." (*Id.*, cleaned up.) AKF also argues that "[t]he restraining notice can properly freeze funds even if the judgment debtor claims they are trust funds, as here." (*Id.*) AKF questions "why [Plaintiff] file[d] in Arizona at all," contends that Plaintiff acted with "unclean hands," and argues that "[Plaintiff]'s New York counsel had correctly identified the procedure for relief from the restraining notice on April 21, 2026: filing a motion 'to vacate or modify the restraint.'" (*Id.* at 7-9.) Finally, AKF argues that "declaratory judgments and injunctions are remedies, rather than causes of action." (*Id.* at 17.)

###### 2.    Discussion

AKF obtained a $193,218.69 judgment against Plaintiff, issued by a New York state court. AKF then utilized a tool available to it under New York law and served a CPLR § 5222 restraining notice on Wells Fargo. Under New York law, the service of this restraining notice functionally operated as an injunction, issued by the New York state court that entered the judgment, compelling Wells Fargo to freeze the funds at issue pending further proceedings. *See, e.g.*, *Cruz v. TD Bank, N.A.*, 22 N.Y.3d 61, 76 (N.Y. 2013) ("Whether issued by a court or an attorney acting as an officer of the court, a restraining notice is an injunction and disobedience is punishable as a contempt of court.") (cleaned up); *Doubet, LLC v. Trustees of Columbia Univ. in City of New York,* 2011 WL 2636259, *10 (N.Y. Sup. Ct. 2011), *aff'd*, 99 A.D.3d 433 (N.Y. App. Div. 2012) ("Although CPLR 5222(a) permits an attorney for the judgment creditor to issue a

---

[9]    Because Wells Fargo "takes no position on the merits of the dispute" (Doc. 17 at 3), the analysis here focuses on the arguments made by Plaintiff and AKF.

- 8 -

restraining notice without the court's involvement, it is legal process nonetheless. . . . The restraining notice operates like an injunction. Indeed, it is an injunction, issued by the attorney acting as an officer of the court.") (cleaned up); *Aspen Indus., Inc. v. Marine Midland Bank*, 52 N.Y.2d 575, 579 (N.Y. 1981) ("[T]he restraining notice serves as a type of injunction prohibiting the transfer of the judgment debtor's property. This notice may be served on either the judgment debtor himself or, as in the present case, upon a third-party 'garnishee'—a person who owes a debt to the judgment debtor or who is in possession of property in which the judgment debtor has an interest. When served upon a garnishee, the injunctive effect of the restraining notice continues for one year or until such time as the judgment is satisfied or vacated, whichever occurs first . . . .").[10] Wells Fargo then proceeded to restrain funds held in the Arizona Accounts. Although Plaintiff raises various arguments as to why it believes the restraint of the Arizona Accounts is substantively and procedurally impermissible under CPLR § 5222 and/or Arizona law, the Court is skeptical that this lawsuit is a proper vehicle for advancing such challenges. Rather, it appears that the appropriate way to advance such challenges would be to seek relief in the same New York state court that issued the restraining notice.

CPLR § 5222 provides, in relevant part, that "[a] restraining notice may be issued by . . . the attorney for the judgment creditor as officer of the court" and that "[a] judgment debtor or obligor served with a restraining notice is forbidden to make or suffer any sale, assignment, transfer or interference with any property in which he or she has an interest, except as set forth in subdivisions (h) and (i) of this section, and except upon direction of the sheriff or pursuant to an order of the court, until the judgment or order is satisfied or

---

[10]     Although it may not be intuitive that an attorney of a judgment creditor is functionally allowed to issue an injunction, "CPLR § 5222 reflects a policy judgment by the New York legislature—which this Court is not free to second-guess—that an attorney's status as 'officer of the court' when issuing a restraining notice should prevent abuse." *Wells Fargo Bank NA v. Wyo Tech Investment Group LLC*, 385 F. Supp. 3d 863, 871 (D. Ariz. 2019) (citing *Save Way Oil Co. v. 284 E. Parkway Corp.*, 453 N.Y.S.2d 554 (N.Y. Civ. Ct. 1982)). *See also* N.Y. C.P.L.R. § 5222, cmt. 5222:1 (practice commentary) ("It is a rare example of an injunction, complete with contempt punishment as its sanction, not embodied in a court order or judgment.") (cited with approval in *CSX Transp., Inc. v. Island Rail Terminal, Inc.*, 879 F.3d 462, 465 n.1 (2d Cir. 2018)).

vacated." *Id.* § 5222(a), (b).

In *Hillwick Inc. v. Advanced Ready Mix Supply Corp.*, 2017 WL 4694865 (N.Y. Sup. Ct. 2017), the New York Supreme Court, quoting McKinney's CPLR Practice Commentaries 5222:9 Vacating the Notice, stated that "[i]f the restraining notice is defective in some way, . . . or for any other reason that undermines it, it can be vacated on motion. *The motion should of course be made to the court out of which the restraining notice issued (i.e., was captioned)*, which will usually but not invariably be the court that rendered the judgment being enforced." *Id.* at *3 (emphasis added).

Similarly, in *CSX Transp., Inc. v. Emjay Env't Recycling, Ltd.*, 2016 WL 6495530 (E.D.N.Y. 2016), the Eastern District of New York explained that "[a]lthough no other case appears to have addressed this precise issue, the natural reading of Section 5222 suggests that *only the court that issued the judgment may vacate a restraining notice*. Permitting any court in any circumstance to undo a restraining notice would not only injure the rights of creditors but also threaten [the issuing court's] injunctive power.  On that basis, the Garnishees' expansive reading would produce absurd results." *Id.* at *5 (emphasis added).  The court went on to note that "[t]he Practice Commentary to Section 5222 reinforces" this interpretation.  *Id.*  The Second Circuit then affirmed.  *CSX Transp., Inc.*, 879 F.3d 462.  The Second Circuit began by noting that it was "unaware of any New York cases that precisely address the issue before [it]" but that nevertheless "the plain and unambiguous meaning of C.P.L.R. § 5222(b) is that 'the' court refers to the court out of which the restraining notice issued.  The use of the definite article 'the' indicates a singular court, whereas the indefinite article 'any' or 'a' denotes multiple courts." *Id.* at 470-71. The Second Circuit also stated that "permitting a second court to dissolve a restraining notice issued out of the first court would injure the rights of creditors and threaten the first court's injunctive power." *Id.* at 471.

The Court agrees.  Not only is Plaintiff's request contrary to the text of § 5222, but Plaintiff is effectively asking the Court to interfere with an injunction issued by a New York state court.  That, at the very least, raises serious federalism concerns.  *Pressman v.*

*Neubardt*, 2002 WL 31780183, *3-4 (S.D.N.Y. 2022) (dismissing a lawsuit that Pressman filed in federal court, which sought to vacate CPLR § 5222 restraining notices that judgment creditors had served on certain third parties after obtaining a judgment against Pressman in New York state court, both because (1) "a restraining notice serves as an enforcement device and is therefore deemed an adjunct of the action that gave rise to the judgment," so "a party seeking to vacate a restraining notice is to proceed by motion in the court in which the restraining notice was issued, and not through a plenary action"; and (2) "[t]he restraining notice at issue in this case is a state court proceeding within the meaning of the Anti–Injunction Act," so "Plaintiff's request would impede the enforcement proceedings related to a New York State Supreme Court judgment").

The Court reached a similar conclusion in an earlier case, recognizing that "in general, the proper court in which to dispute the validity of a restraining notice is the 'court out of which the restraining notice issued.'" *Wyo Tech*, 385 F. Supp. 3d at 872 (quoting *CSX Transportation, Inc,* 879 F.3d at 471). Tellingly, Plaintiff started going down that path in this case, by filling out the formal New York state court exemption form (Doc. 19-3 at 20) and threatening, via its New York counsel, to pursue expedited relief in New York state court (Doc. 19-3 at 3).

Moreover, even if it were theoretically possible for Plaintiff to file a lawsuit in Arizona state court, rather than New York state court, to challenge the restraining notice, Plaintiff has failed to demonstrate a likelihood of success on the merits (or serious questions going to the merits) for other reasons. As noted, the complaint asserts three causes of action: (1) "Declaratory Judgment"; (2) "Temporary, Preliminary, And Permanent Injunctive Relief"; and (3) "Wrongful Restraint / Equitable Relief." But as for Counts One and Two, "[d]eclaratory and injunctive relief are remedies, not causes of action." *Ajetunmobi v. Clarion Mortg. Cap., Inc.*, 595 F. App'x 680, 684 (9th Cir. 2014). *See also Kendrick v. World Savings Bank*, 2016 WL 1268519, *5 (D. Ariz. 2016) ("It is well-established law that injunctive relief is not an independent cause of action, and in order to succeed on a claim for injunctive relief, Plaintiff must first offer a valid cause of

- 11 -

action for which injunctive relief would be a remedy."); *Thomas v. Wells Fargo Home Mortg., Inc.*, 2012 WL 122803, *2 (D. Ariz. 2012) ("[I]njunctive and declaratory relief are remedies for underlying causes of action . . . not separate causes of action.") (cleaned up). Although Count One is brought "pursuant [to] A.R.S. § 12-1831," that statute provides for a "declaratory judgment action" and "is not a separate cause of action as Plaintiff alleges." *Snyder v. HSBC Bank, USA, N.A.*, 913 F. Supp. 2d 755, 770 (D. Ariz. 2012). *See also Horne v. Hobbs*, 576 P.3d 108, 115 (Ariz. Ct. App. 2025) ("Although an action for declaratory relief is remedial and to be liberally construed, A.R.S. § 12-1842, the plaintiff must have an underlying cause of action . . . .").[11]

That leaves Plaintiff's claim in Count Three for "wrongful restraint/equitable relief." An initial difficulty with Count Three is that Plaintiff has not clearly specified the basis for this claim or identified the elements that must be proved to succeed on it. The complaint does, in fairness, cite A.R.S. § 12-1702, arguing that AKF "has not complied with the mandatory requirements imposed under A.R.S. § 12-1702 authorizing enforcement against the [Arizona Accounts]." (Doc. 1-5 at 6 ¶ 22.) It also appears possible that Plaintiff seeks to assert a state-law claim for wrongful garnishment. *Cf. Andrew Brown Co. v. Painters Warehouse, Inc.*, 466 P.2d 790, 793 (Ariz. App. 1970) ("Our Supreme Court has allowed a claim for wrongful garnishment to be asserted . . . in an independent action."). Either way, Plaintiff has not established a likelihood of success on, or serious questions going to the merits of, Count Three.

As an initial matter, Plaintiff assumes, without providing any analysis, that Arizona law applies here. Plaintiff then relies on that assumption as the foundation for its arguments regarding the purported need for Arizona domestication and the purported invalidity of any restraint over funds being held in trust for third parties. But if New York law applies here,

---

[11]    Moreover, even if Plaintiff had properly asserted a claim for declaratory relief, "[a] . district court is not required to exercise jurisdiction over a declaratory judgment action . . . and in fact should not exercise its discretion to grant declaratory relief 'where another suit is pending in a state court presenting the same issues, not governed by federal law, between the same parties.'" *Progressive Direct Ins. Co. v. Harris*, 2026 WL 860592, *1 (W.D. Wash. 2026) (quoting *Chamberlain v. Allstate Ins. Co.*, 931 F.2d 1361, 1366-67 (9th Cir. 1991)).

those arguments would likely lack merit.[12]  And the Court questions whether Arizona law would apply in this circumstance (even assuming, contrary to the discussion in the preceding paragraphs, that a lawsuit filed in Arizona state court is a permissible vehicle for raising these sorts of challenges).

In *Neill v. Bank of Am., N.A.*, 2012 WL 13034847 (S.D. Cal. 2012), the plaintiffs argued that "Defendant was enforcing a New York judgment [pursuant to CPLR § 5225(b)] in California, and therefore [California's Sister State Judgment Act] applied, requiring Defendant to domesticate the judgment in California prior to seizing any funds." *Id.* at *8. The court disagreed, explaining that "the New York court had jurisdiction over [Defendant] to issue the restraining notice on the deposit account.  Under this circumstance, California's attachment procedure as provided in California's SSJA is not applicable.  [Defendant], by abiding by the restraining notice as garnishee, was part of an enforcement of the New York judgment in New York, and not in California.  California enforcement procedure as outline[d] in California's SSJA was not implicated." *Id.* at *9.  *Neill* casts doubt on Plaintiff's assumption that Arizona law governs the disputed issues here and, at a minimum, demonstrates that Plaintiff has failed to establish a likelihood of success on the

---

[12]    Although Plaintiff argues that, under Arizona law, bank accounts holding third-party trust funds may not be restrained or garnished, under CPLR § 5222, "[a] bank or other garnishee is required to apply the restraint to a particular debt or property specified in the restraining notice even if it appears that the debt or property, including bank accounts, is not in the debtor's name or is otherwise property in which the debtor does not have a right or property interest."  Effect of restraining notice, 4B N.Y. Prac., Com. Litig. in New York State Courts § 66:16 (5th ed.).  Indeed, "CPLR § 5222 allows a judgment creditor to freeze a bank account held by a third party based solely on an assertion by the judgment creditor's attorney that the judgment debtor holds an interest in the account—there is no requirement that the judgment creditor establish this interest to a judge before the restraining notice may issue." *Wyo Tech*, 385 F. Supp. 3d at 867. *See generally Glob. Tech., Inc. v. Royal Bank of Canada*, 2012 WL 89823, *12 n.9 (N.Y. Sup. Ct. 2012) ("[A] party that seeks a restraining notice need only engage an attorney, who is authorized to issue a restraining notice as an officer of the court.  The Court has no involvement with the issue of whether service of the restraining notice upon the garnishee comports with due process until the garnishee challenges the restraining notice, or until the judgment debtor seeks an order of contempt or a money judgment against the garnishee.") (citation omitted).  This is because, as discussed in more detail elsewhere in this order, New York law contemplates that the issuance of a restraining notice will be followed by a subsequent proceeding—either the filing of objections by the judgment debtor or the initiation of a turnover proceeding by the judgment creditor—during which factual questions over the judgment debtor's interest in the restrained funds can be resolved.

merits or serious questions going to the merits.

What's more, Plaintiff operates from the premise that AKF is pursuing a "garnishment" and uses that framing as the basis for its arguments regarding domestication requirements. (*See, e.g.*, Doc. 1-5 at 2 ¶ 1 ["[AKF] is attempting to use a New York garnishment to unilaterally garnish . . . ."]; *id.* at 7 ¶ 23 ["[AKF] served a 'garnishment' on a Wells Fargo branch located in New York."].)  The problem with this framing is that the issuance of a CPLR § 5222 restraining notice does not result in any garnishment—it simply freezes the funds in anticipation of the judgment creditor subsequently filing a motion for affirmative relief in the court that issued the judgment.  *See generally Wyo Tech*, 385 F. Supp. 3d at 871 ("[T]he purpose of a restraining notice . . . is to maintain the status quo while the judgment creditor seeks turnover of the disputed funds.  A judgment creditor issues a restraining notice against a judgment debtor's bank account to secure funds for later transfer to the judgment creditor through a sheriff's execution or turnover proceeding.  After a restraining notice is issued, the issuing party separately may litigate, in a turnover proceeding, its claims that transfers were made without fair consideration, that the [third parties] are the alter egos of the various corporate respondents, and that the corporate veil may be pierced. . . .  [T]he restraining notice itself does not require turnover of the funds and simply requires maintenance of the status quo until a contested turnover proceeding . . . .") (cleaned up); *USA Auto Funding, LLC v. Washington Mut., Inc.*, 2006 WL 1493115, *1 (N.Y. Sup. Ct. 2006)  ("[T]he restraining notice confers upon the creditor no lien upon or interest in the property nor any priority as against other creditors.  To achieve these objectives further enforcement procedures are required.  A restraining notice operates as an injunction.  It merely restrains a party upon which it is served from making any transfer.") (cleaned up).

For these reasons, Plaintiff has not established a likelihood of success on—or even serious questions going to the merits of—the claims asserted in the complaint.[13]

---

[13]     Given this determination, it is unnecessary to resolve the parties' legal dispute regarding the separate entity rule or to resolve the parties' factual dispute over whether the Arizona Accounts are, in fact, third-party trust accounts.  Nevertheless, the Court notes that, as to the former issue, respected jurists have reached opposite conclusions.  *Compare*

## B.    **Remaining *Winter* Factors**

"In the absence of serious questions going to the merits, the court need not consider the other [*Winter*] factors." *Roe v. Critchfield*, 137 F.4th 912, 922 (9th Cir. 2025) (cleaned up). Thus, Plaintiff's PI motion must be denied based solely on the conclusions set forth in Part II.A above.

But even if Plaintiff had shown serious questions, "a preliminary injunction may still issue [only] if the 'balance of hardships tips sharply in the plaintiff's favor,' and the other two *Winter* factors are satisfied." *Shell Offshore, Inc.*, 709 F.3d at 1291. In an abundance of caution, the Court further clarifies that Plaintiff has not demonstrated a likelihood of irreparable harm in the absence of preliminary relief or that the balance of hardships tips sharply in its favor.

As for the former issue, Plaintiff argues that the restraining notice "is creating irreparable harm as it interferes with the return of security deposits to tenants, remittance of rent proceeds and owner funds to landlords, and use of maintenance reserves for designated properties." (Doc. 1-8 at 13-14.) Plaintiff also argues that "[t]he injury is not merely monetary," pointing to "potential regulatory consequences" (*id.* at 14) and, at oral argument, the reputational harm it faces.

The Court is sympathetic to Plaintiff's argument that the restraint of the accounts in question may cause it to sustain harm. However, "[i]rreparable harm is traditionally defined as harm for which there is no adequate legal remedy . . . ." *Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014). Here, Plaintiff is not without adequate legal remedy. As discussed, Plaintiff can seek relief in New York state court and file a motion to vacate the restraining notice based on the arguments it has presented here. *See, e.g.*, *Plaza Hotel Assocs. v. Wellington Assocs., Inc.*, 378 N.Y.S.2d 859, 862 (N.Y.

_____

*Wells Fargo Bank NA v. Wyo Tech Inv. Grp. LLC*, 2018 WL 3648417, *3 (D. Ariz. 2018) ("[T]he separate entity rule only applies to accounts in foreign branches, it is inapposite here.") *with WAG SPV I, LLC v. Fortune Glob. Shipping & Logistics, Ltd.*, 612 F. Supp. 3d 321, 334 n.8 (S.D.N.Y. 2020) ("[T]he Court also acknowledges that a district court in the District of Arizona has expressed the opinion that . . . 'the separate entity rule only applies to accounts in foreign branches.' The Court respectfully disagrees . . . .") (citation omitted).

Sup. Ct. 1975) ("Wellington Associates, a partnership, moves for a protective order . . . vacating a restraining notice issued by plaintiff-judgment creditor to Chase Manhattan Bank affecting Wellington Associates' account (CPLR 5222)."); *Feinberg Furniture Co. v. Overbaugh*, 303 N.Y.S.2d 197, 197-98 (N.Y. Co. Ct. 1969) ("The defendant moves to vacate and set aside a restraining notice issued by the attorney for the judgment creditor in accordance with CPLR § 5222 and served upon the Montgomery County Trust Company, a banking institution in the City of Amsterdam."). That avenue of potential relief—which Plaintiff had already started pursuing before it changed course and filed this lawsuit— undermines Plaintiff's claim of irreparable harm. *Cf. Wisc. Cent. Ltd. v. Pub. Serv. Comm'n of Wisc.*, 95 F.3d 1359, 1369 (7th Cir. 1996) ("The railroads have not demonstrated that they will suffer irreparable harm because they have failed to show that the procedures Wisconsin has provided for seeking just compensation are inadequate. Indeed, they have failed to avail themselves of those procedures."); *Joseph v. Cnty. of Los Angeles*, 2025 WL 3190911, *1 (C.D. Cal. 2025) ("Plaintiff has not adequately alleged that Plaintiff will suffer irreparable harm absent this TRO. The TRO application references a related, Unlawful Detainer action, currently pending in Los Angeles Superior Court, Case No. 25NWUD01475. Plaintiff has insufficiently established that Plaintiff cannot seek the same relief requested in the instant application from the state court, which is already exercising jurisdiction over this matter."); *In re Forest Grove, LLC*, 448 B.R. 729, 743-44 (Bankr. D.S.C. 2011) ("Most significantly, Debtor did not establish it would suffer irreparable harm . . . . It is clear that Debtor has an alternative avenue for relief, as Debtor is already moving forward in state court.").

Moreover, during the PI hearing, Plaintiff failed to establish that, at least in the short term (i.e., until such time as it can seek relief in New York), it lacks the funds necessary to cover its expected outflows of security deposits and similar expenses.[14] Notably, in April 2026, Plaintiff (through its New York counsel) offered to begin paying off the outstanding

[14]   In a related vein, if Plaintiff is able to use other funds, at least in the short term, to cover those expenses, it is unclear how or why Plaintiff would suffer any reputational harm.

- 16 -

judgment via an initial payment of $25,000 and subsequently weekly payments of $1,000 to $1,200.  (Doc. 19-3 at 16.)  And when AKF's counsel attempted to question Juarez during the PI hearing about other bank accounts held by Plaintiff and the amount of money currently in those accounts, Plaintiff objected and argued that AKF should not be given access to such information (because AKF might use it for further collection efforts).  Although the Court appreciates the strategic dilemma these questions may have created for Plaintiff, the bottom line is that Plaintiff declined to provide a complete picture of its finances, its anticipated short-term expenses, and the cash currently available to it.

Plaintiff also contends that its failure to maintain the integrity of funds held in trust and/or its use of funds in other accounts to repay security deposits and the like may expose it to "regulatory consequences."  However, Plaintiff's showing on this point during the PI hearing was, at least in the Court's view, speculative and undeveloped.  The record indicates that Plaintiff already "had to self report to the Arizona Real Estate Department" as of April 15, 2026.  (Doc. 19-3 at 7.)  There is no evidence that Plaintiff has suffered any regulatory consequences in the nearly three-month period since that act of self-reporting.

Additionally, the point of a preliminary injunction is to avoid irreparable harm that will likely arise in the future in the absence of injunctive relief.  Here, a regulatory violation has apparently already occurred and Plaintiff has already self-reported that violation.  Plaintiff has failed to articulate why the issuance of a preliminary injunction now would eliminate or reduce the regulatory consequences for the already-committed and -reported violation. *Cf. Night Vision Devices, Inc. v. Carson Indus., Inc.*, 2020 WL 430755, *2 (E.D. Pa. 2020) (denying request for preliminary injunction in part because the complained-of "harm has already transpired . . . and is therefore not grounds for an injunction to prevent irreparable harm that is likely to occur in the future" and noting that "[t]he Court cannot put the toothpaste back in the tube").

Finally, turning to the balance of equities, although the Court does have some concern—on this admittedly undeveloped record—that the restrained funds include money Plaintiff is simply holding in trust for innocent third parties, it must not be overlooked that

the parties' dispute arises from Plaintiff's efforts to avoid paying a nearly $200,000 judgment that was entered against it after losing in an arbitration that concluded in 2025. Under these circumstances, the balance of equities does not tip so sharply in Plaintiff's favor as to make up for its showing as to the remaining *Winter* factors. *Cf. Beverly Milligan of Toronto v. Cheetah Int'l, Inc.*, 2013 WL 3724896, *3 (D. Colo. 2013) ("Sound public policy dictates that judgment creditors should be allowed to execute on the valuable assets of judgment debtors and that judgment debtors should not be allowed to waste their assets merely to frustrate the interests of a judgment creditor.").[15]

Accordingly,

**IT IS ORDERED THAT**:

1.    Plaintiff's request for a preliminary injunction (Doc. 1-8) is **denied**.

2.    The TRO issued by the state court (Doc. 1-9) is **dissolved**.

3.    The parties shall meet and confer, and, within 7 days of the issuance of this order, file a joint statement setting forth their respective positions on how the parties would like to proceed, and, if applicable, a deadline for AKF's reply in support of its motion to dismiss.

Dated this 7th day of July, 2026.

Dominic W. Lanza
United States District Judge

---

[15]    To the extent AKF seeks its attorneys' fees under A.R.S. § 12-341.01 and/or 28 U.S.C. § 1927 (Doc. 19 at 18-19), that request is denied. As for the former statutory provision, "simply defending against Plaintiff's [preliminary injunction request] does not make [AKF] the successful or prevailing party under Section 12-341." *Infante v. Namecheap Inc.*, 2025 WL 2174048, *6 (D. Ariz. 2025). As for the latter statutory provision, the Court rejects the notion that Plaintiff's counsel "unreasonably and vexatiously" multiplied the proceedings or acted in bad faith. Although the Court has denied relief, Plaintiff's arguments were not frivolous and it is apparent to the Court that Plaintiff's counsel has acted in good faith at all times.